# In the United States Court of Federal Claims

No. 13-393C
(Filed: April 9, 2014)

```
*************************************
                                    *
KC RESOURCES, INC.,                 *
                                    *
            Plaintiff,              *
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
                                    *
*************************************
```

## OPINION AND ORDER

Plaintiff, KC Resources, Inc. ("KCR"), brings this action alleging that the United States (the "Government") is liable to KCR for both an uncompensated taking and for an alleged breach of contract. The Government has moved for dismissal under Rules of the Court of Federal Claims ("RCFC") 12(b)(1) or, in the alternative, RCFC 12(b)(6).

After review of the pending motion and associated briefing, the Court concludes that it is unnecessary to reach the Government's arguments under RCFC 12(b)(6). Rather, the Court finds that it lacks jurisdiction over KCR's Complaint. Hence, the Government's motion is granted under RCFC 12(b)(1).

## I. Background

### a. Regulatory Background

This case is generally about gas drilling on public lands. The key issue in the pending motion revolves around the legal status and relationship of the parties with respect to these drilling activities, which are governed by statute and regulations promulgated by the Bureau of Land Management ("BLM"). It is therefore useful to begin with a brief recitation of the relevant statutory and regulatory framework.

The Mineral Leasing Act of 1920 (the "Act"), ch. 65, 41 Stat. 437 (1920) (codified, as amended, at 30 U.S.C. § 181 *et seq.*) (1981), authorizes the leasing of public lands, *i.e.* lands "owned by the United States," for the purpose of developing deposits of minerals, oil and gas. Pursuant to the Act, BLM issues oil and gas leases authorizing exploration and development activities by private entities. As stated, it also promulgates regulations relating to such leasing activities. Under the regulations, a "lessee" is defined

as the "entity holding record title in a lease issued by the United States." 43 C.F.R. § 3100.0-5(i). "Record title means a lessee's interest in a lease." 43 C.F.R. § 3100.0-5(c). This interest "includes the obligation to pay rent, and the rights to assign and relinquish the lease." *Id.*

In contrast to a lessee, an "operator" is an "entity, including, but not limited to, the lessee or operating rights owner, who … is responsible under the terms and conditions of the lease for the operations conducted on the leased lands or portions thereof." 43 C.F.R. §3100.0-5(a). "[O]perating rights" are severable from record title interest, 43 C.F.R. §3100.0-5(c), meaning that they are merely one stick of the proverbial property rights bundle.

The regulations also distinguish between "assignments" of all or a portion of interests from "subleases," which refer to a "transfer of non-record title interest in a lease, *i.e.*, a transfer of operating rights is normally a sublease." 43 C.F.R. § 3100.0-5(e). Such a transfer of operating rights "is a subsidiary arrangement between the lessee (sublessor) and the sublessee … [which] does not … affect the relationship imposed by a lease between the lessee(s) and the United States." *Id.*

### b. The Lease, Operator Rights and Basis for the Dispute

On September 1, 1950, BLM executed a lease with A.R. Davis (the "Lease") for certain public lands in Colorado. *See* Compl. Ex. 1. Through a series of assignments, the rights of the lessees were acquired by British Petroleum America Production Company ("BP") and Pioneer Natural Resources USA, Inc. ("Pioneer"). Gov't Ex. A at 1.

On May 24, 2002, KCR obtained operator rights under the Lease. Compl. at ¶ 8. At all relevant times, there were two gas wells (referred to herein as AR Davis # 1 and AR Davis # 2; collectively, the "Wells") on the Lease property. *Id.* at ¶ 9. On January 30, 2008, the Government sent two letters (the "January 30 Letters") to KCR which stated that the Wells had not been producing in paying quantities[1] since 1988 and 2003, respectively. *See* Compl. Ex. 2. As a result, the January 30 Letters directed KCR to do one of the following:

> (1) Return the wells to production, in paying quantities;
> (2) Submit supporting documentation if KCR believed the wells were capable of producing in paying quantities; or
> (3) Submit a Notice of Intent to Abandon with plugging procedures for the wells.

---

[1] The January 30 Letters define "paying quantities" as "production of oil and gas of sufficient value to exceed direct operating costs and the costs of lease rentals, or minimum royalty, on a sustained basis." *See* Compl. Ex. 2.

*See* Compl. Ex. 2.  KCR, believing that it was not obligated to do anything since it believed the Wells were already producing in paying quantities, did nothing in response to the letters.  *See* Compl. ¶¶ 14-15.

On April 2, 2008, BLM sent to KCR two Notices of Incident of Noncompliance ("INC"), one for each of the Wells, informing KCR that it had failed to comply with the January 30 Letters.  *See* Compl. Ex. 3 (letters referencing the two INCs).  Again on May 15, 2008, BLM issued a second set of INCs for KCR's failure to comply with the prior INCs.  Shortly thereafter, on June 17, 2008, BLM sent KCR two "Initial Notice[s] of Proposed Civil Penalties" which were followed on July 2, 2008, by two "Second Notice[s] of Proposed Civil Penalties."  *Id.*

On July 31, 2008, BLM sent two additional letters entitled "Final Notice[s] of Proposed Civil Penalties" resulting from KCR's failure to comply with the numerous previous notices.  Compl. Ex. 3.  These Final Notices informed KCR that civil penalties could be levied and that cancellation proceedings could be initiated.  *Id.*  The Final Notices informed KCR that it could request an Administrative Review and explained the process for doing so.  *Id.*

Instead of following the instructions in the Final Notices, KCR opted to email BLM on August 6, 2008, and explain that it believed that the Lease – not the Wells – was producing in paying quantities.  Compl. Ex. 4.  BLM responded two days later, explaining that it was not contesting the production status of the entire Lease, but only of the Wells.  Compl. Ex. 5.  BLM also stated that there were no records supporting KCR's assertion of production in paying quantities and that site inspections supporting the finding that the Wells were not producing in paying quantities.  *Id.*

On October 15, 2008, KCR sent a follow-up email.  Compl. Ex. 6.  In this email, KCR admitted that the records on which BLM had based its decision did show that the Wells were not producing in paying quantities, but asserted that the information contained in those records was incorrect.  *Id.*  KCR alleges that this email is evidence that the Wells had been producing in paying quantities since 2007, but the attached Exhibit does not contain any documents in support of the assertions made in the email.

In April 2009, the Government contacted KCR and informed KCR that its email communications with BLM were invalid, *see* Compl. at ¶ 25, presumably because they were not filed in accord with the instructions provided by the BLM.  KCR was also informed that penalties would be assessed against it and that the Wells had to be plugged and abandoned.  The Government also demanded that BP, the primary lessee, plug the Wells.  *Id.* at ¶ 26.

On September 17, 2009, BLM received notices from BP seeking BLM approval for BP's plan to plug the Wells.  Gov't Ex. D at 1-6, 13-18.  The notices were approved, with conditions not relevant here.  On December 5, 2009, the AR Davis # 1 well was plugged, and on December 14, 2009, the AR Davis # 2 well was plugged.

3

### c. Procedural History

KCR brought the instant action on June 12, 2013. In its Complaint, KCR alleges that the Government is liable to it for a taking under the Fifth Amendment and that the Government is liable to KCR for breach of contract. On October 28, 2013, the Government timely filed the pending motion to dismiss. Briefing was completed on January 8, 2014.

## II. Legal Standard

A motion brought pursuant to RCFC 12(b)(1) challenges the Court's subject matter jurisdiction. *See* RCFC 12(b)(1). This Court's jurisdiction is carefully delineated. Absent congressional consent to entertain suits against the United States, this Court does not possess jurisdiction. *United States v. Testan*, 424 U.S. 392, 399 (1976). Such consent, a waiver of sovereign immunity, must be expressly stated and cannot be implied. *INS v. St. Cyr*, 533 U.S. 289, 299 n. 10 (2001).

Once challenged, the plaintiff bears the burden of establishing subject matter jurisdiction. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). The plaintiff must produce preponderant evidence in support of its claim of jurisdiction. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). In ruling upon a motion to dismiss under RCFC 12(b)(1), the Court must presume all undisputed factual allegations in the Complaint to be true and must resolve all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

The Court may look to evidence outside of the pleadings in order to ascertain the propriety of its exercise of jurisdiction over a case. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991), *aff'd in relevant part*, *Martinez v. United States*, 281 F.3d 1376 (Fed. Cir. 2002). If jurisdiction is lacking, the Court must dismiss the action. RCFC 12(h)(3).

## III. Discussion

### a. Standing

The Government asserts that KCR lacks standing to bring either of its counts against the United States. Standing is jurisdictional, *see Hoopa Valley Tribe v. United States*, 597 F.3d 1278, 1283 (Fed. Cir. 2010), and the burden to prove standing therefore lies with KCR. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Because the Government challenges both Counts in KCR's Complaint for lack of standing, the burden on both issues lies with KCR.

Although this Court is not an Article III court, it applies the same constitutional standing requirements as its Article III sisters. *Glass v. United States*, 258 F.3d 1349,

1355-56 (Fed. Cir. 2001).  A showing of standing requires the plaintiff to demonstrate that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable disposition."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

### b. KCR Lacks Standing With Respect to its Takings Claim

The Government argues that KCR lacks standing to bring a takings claim because it was not the operator at the time the Wells were plugged.  To this end, it emphasizes that a cognizable takings claim accrues only to the owner of a property right interest at the time a taking occurs.  *See CRV Enterprises, Inc. v. United States*, 626 F.3d 1241, 1249 (Fed. Cir. 2010) ("It is well established that 'only persons with a valid property interest *at the time of the taking* are entitled to compensation.'") (quoting *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001)) (emphasis added); *see also United States v. Dow*, 357 U.S. 17, 20-21 (1958 (A takings claimant "can only prevail if the 'taking' occurred while he was the owner.  For it is undisputed that '(since) compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment.'") (quoting *Danforth v. United States*, 308 U.S. 271, 284 (1939)).  The Government argues that KCR abandoned its status as operator prior to the plugging of the Wells, and thus was not an owner at the time the taking occurred.

KCR, in its response, does not argue that it had not in fact relinquished its operator status prior to the taking.  Instead, it argues that in an administrative appeal, BLM—notably, applying BLM's own regulations—found that it was still the operator because KCR had not filed any notice of a change in operator status with BLM.  KCR Resp. at 6.  Hence, the last operator of record in BLM's files was KCR.

As the Government argues in its reply, BLM's decision is entirely irrelevant to the issue now before the Court.  The administrative appeal revolved around the process of reclaiming the surface after the Wells were plugged, and KCR was attempting to avoid any liability as to that issue.  *See* 43 C.F.R. §3162.5-1(b) (BLM regulation stating that, upon conclusion of operations, "the operator shall reclaim the disturbed surface in a manner approved or reasonably prescribed by the authorized officer.").  Under its own regulations, BLM still considers KCR the operator because KCR is the last operator recorded in writing; that does not mean that it *was* still the operator on the date of taking.

Notably, KCR's stance in the administrative appeal is directly contrary to the position it now takes.  The Government has provided the Court with a highly relevant filing submitted by KCR in the administrative appeal wherein KCR alleged that it was not the operator at the time of plugging.  In this administrative action, KCR actually submitted evidence that it had relinquished its operator status.  This evidence, which the Court may consider, is dispositive as to KCR's takings claim: KCR had relinquished any rights it had on September 1, 2009, several months prior to the date that the Wells were

plugged (and the "taking" accrued).  Thus, KCR has not suffered an "injury in fact," as required by *Lujan*, because it abandoned any interest it had in the property at issue.

### c.  The Court Lacks Jurisdiction Over KCR's Contract Claim

The Government challenges this Court's jurisdiction over KCR's breach of contract claim for lack of privity.  It asserts that KCR has no privity of contract with the Government, and thus lacks standing.  *See* Gov't Mot. at 17 (citing *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999)).  KCR does not put forth much effort in substantively countering the Government's privity argument, but argues more strenuously that it should be allowed to amend its complaint to cure the jurisdictional deficiency by adding BP as a necessary party.  In its reply, the Government argues that even if privity could be established by the addition of BP to the case, amending the Complaint would prove futile because KCR had abandoned its rights as an operator.

The Court agrees with KCR that its privity defect could be cured by the addition of BP to this case, since BP itself is in privity of contract with the Government.  *See Devon Energy Corp. v. United States*, 45 Fed.Cl. 519, 531 (1999) (Margolis, J.).  That said, this fact alone is insufficient to salvage KCR's suit because as the Government argues, KCR's link to this case exists only as an operator under the Lease and, as discussed above, KCR had ceased operations at the Wells several months prior to plugging.  Even if it cured the privity defect by amending its Complaint to include BP as a necessary party, KCR would still lack standing as it suffered no injury due to the plugging because, at the time of plugging, KCR was nothing more than a disinterested third party.

### IV.   Conclusion

In sum, even though KCR lacks privity with the Government under its current Complaint, amendment would prove futile as KCR was not an operator at the time that the Wells were plugged.  Thus, it has no standing to bring either Count in its Complaint before this Court: it owned no property rights in the Wells (operator or otherwise) at the time the Wells were plugged, such that it possessed no property rights subject to taking.  Likewise, KCR's abandonment of its operator status effectively revoked any rights under the Lease, which required that the Wells produce in paying quantities.

In practical effect, everything that happened in this case is the result of KCR's lackadaisical treatment of BLM's numerous letters and notices.  Rather than informing BLM that it believed that the Wells were producing in paying quantities as instructed in the several iterations of the letters, KCR opted to pretend like nothing was happening and hope that if it ignored BLM's letters, all of KCR's problems would go away.[2]  Further

---

[2] In this regard, the Court notes that KCR's inaction effectively severed the link between BLM's actions and whatever harm KCR may have suffered.  In legal terms, the alleged

exacerbating the situation, KCR opted to abandon its status as operator—and all rights appurtenant thereto—prior to the alleged taking.

      For the foregoing reasons, the Court concludes that KCR lacks standing to bring its taking claim because it abandoned its rights in the Wells before the alleged taking occurred. Likewise, as currently pled, KCR also lacks privity of contract with the Government. Even if KCR amended its Complaint, however, such amendment would prove futile as once again, KCR had abandoned its status as operator of the Wells. For these reasons, the Government's motion to dismiss is GRANTED and KCR's Complaint is dismissed. The Clerk is directed to enter judgment accordingly.

                                                s/ Edward J. Damich
                                                EDWARD J. DAMICH
                                                Judge

---

injury is no longer "fairly traceable" to the Government's actions, *see Friends of Earth*, 528 U.S. at 180-81, but to KCR's actions alone.